WIGGINS, Justice
(concurring in part and dissenting in part).
I agree with the court’s well-reasoned analysis regarding Smith’s intentional infliction of emotional distress claim. I also mostly agree with the court’s analysis of Smith’s whistleblowing claim under Iowa Code section 70A.28(2) (2007), however, I part ways with the court’s damage analysis regarding the whistleblowing claim.
I begin my analysis by examining the record and the law of the case under this record. The parties stipulated that the jury would decide liability on Smith’s whistleblowing claim and the district court would decide the damage issue. The district court included the agreed-upon elements of the whistleblowing claim in the instructions submitted to the jury. The agreed upon elements that the court instructed on were:
*40 1. The Plaintiff reported to a public official, Iowa State University President Gregory Geoffroy that Pamela Reinig had committed a violation of a law or rule, mismanagement, a gross abuse of funds or an abuse of authority,
2. That Plaintiff reasonably believed the matter he was reporting,
8. That Iowa State University took action or retaliated against the Plaintiff after August 16, 2007, when the president received the Plaintiffs appeal of his first grievance[,]
4. The Defendant’s conduct was a proximate cause of the Plaintiffs damage,
5. The amount of damage[.]
Based on these instructions, the jury answered the following question in the affirmative, “Did Iowa State University retaliate against Plaintiff as explained in Instruction No 11 because he reported certain matters to a public officer?” The jury based its answer on finding Iowa State’s retaliation was the proximate cause of some damage suffered by Smith. The district court then used this law, as used by the jury, to find the facts in favor of Smith on the retaliation claim and to determine Smith’s damages.
The court in its majority opinion disregards the jury’s and the district court’s findings; finds the facts regarding damages anew; and slashes the judgment by $634,027.40, the amount of income the district court found Smith lost because of his termination from employment in August 2010. I would leave the verdict intact.
I reach my conclusion by starting with the legal proposition that when Iowa State stipulated to the jury deciding the liability issue and then failed to object to the instruction, the instruction became the law of the case, even if the instruction misstated the law. Froman v. Perrin, 213 N.W.2d 684, 689 (Iowa 1973); see also Champlin v. Walker, 249 N.W.2d 839, 840 (Iowa 1977); Bus. Ventures, Inc. v. Iowa City, 234 N.W.2d 376, 384 (Iowa 1975); Robert G. Allbee & Kasey W. Kincaid, Envr Preservation in Civil Litigation: A Primer for the Iowa Practitioner, 35 Drake L.Rev. 1, 23 (1985-1986). Thus, the causation requirement for this cause of action was proximate cause.
Next, I agree with the fact finding of the district court and adopt its reasoning. Even though our review is de novo and we are not bound by the district court’s findings, we do “give deference to those findings because the district court had the opportunity to assess the credibility of the witnesses.” Hensler v. City of Davenport, 790 N.W.2d 569, 578 (Iowa 2010).
The court’s majority opinion considers the facts anew regarding causation by finding Dieterle’s and Dr. Kushner’s testimony credible. This finding by our court flies in the face of the district court’s finding regarding the credibility of Dieterle and Dr. Kushner. Specifically, the district court found:
the testimony of Dieterle and Kushner was largely not credible. Kushner’s lack of credibility was especially apparent in matters relating to his recollection of his actions against [Sjmith. The Court was struck with his defense of Reinig despite her confessed theft of ISU funds.
Dieterle’s testimony was less profound, but it was obvious that his goal in the testimony was to protect himself. His testimony would occasionally intersect with the truth, but this was obviously more by coincidence than design.
It is difficult for me to credit Dieterle’s and Dr. Kushner’s testimony in light of the district court’s finding.
*41 Moreover, my review of the evidence supports the district court’s finding. The district court found at one point in its ruling
Dieterle made the determination that Smith’s position would be eliminated. Testimony established that the ECM [Engineering, Communications and Marketing department] was the only unit to have all staff terminated and the only unit to have its own reorganization plan. Despite the fact that the unit was purportedly eliminated, the Director of the ECM, Dieterle, was not terminated. A new unit called Engineering College Relations (“ECR”) was created. Dieterle determined that “new” job descriptions were required to create “new” positions rather than retaining any existing staff besides himself. Smith testified that this was done in order to terminate him and get around existing ISU policies that would prevent doing so and retaining a part-time writer, Jessie Strawn, full-time. Witnesses for Smith corroborated his testimony by testifying that it did not make business sense to eliminate entirely the only cost-recovery unit in the College of Engineering based on budgetary concerns. Smith testified that ISU counsel, Paul Tanaka, had been attempting to get Smith to leave his position in the ECM in 2008. That supports the fact that ISU was engaged in continuous attempts to get rid of Smith. The testimony of Dean Wickert that the elimination of ECM was his decision was brought into question by evidence suggesting that dissolution had been discussed by Dieterle prior to Wic-kert becoming Dean, in approximately September of 2008 in response to an “organizational dilemma.” (Trial Exhibit 114[.]) It is an appropriate inference that Smith was the “organizational dilemma.” Documentary evidence also suggests that contrary to ISU’s testimony, the determination was made as early as January of 2009 that Smith would be terminated. (Trial Exhibit 130[.])
ISU also failed to rehire Smith despite-the fact that he was qualified and a senior full-time employee. Dieterle testified that he had determined the job descriptions for the purportedly new positions. Smith testified that Dieterle had tailored them to favor a part-time writer, Jessi[e] Strawn. Smith also testified that work had been removed from him prior to the termination and assigned to Strawn in anticipation of his termination. ISU’s witnesses testified that a committee was formed to review applications for the position of communication specialist, purportedly to prevent any bias and lend legitimacy to the hiring. However, according to defense witness John Glover, the committee in fact met with Dieterle prior to this process. Ultimately the committee did not make a recommendation or determine whom to hire; rather, the decision was made by Dean Wickert, who acknowledged that he had been briefed on Smith’s lawsuit against ISU upon taking his position as Dean.
Exhibit 130 is especially telling. In this handwritten note, Dieterle and Dr. Kush-ner have Smith retired from the University and his replacement in the new position. Exhibit 130 was authored after Smith complained to President Geoffroy, but before the reorganization of the department took place.
Accordingly, I would accept the findings of the district court and affirm in its entirety.
HECHT, J., joins this concurrence in part and dissent in part.